JOSHUA T. BRADLEY, appellant, *v.* ZOPHAR CASE, Commissioner of School Lands for Clinton County, appellee.

*Appeal from Clinton.*

The legislature has full power to authorize a sale of the sixteenth or school sections of land in the State of Illinois; and a promissory note given to a commissioner of school lands for the purchase of a portion of the same, is founded upon a good and valuable consideration.

The act of Congress "*to enable the people of the Illinois Territory to form a Constitution, &c.,*" and the ordinance passed by the Convention of Illinois that formed the Constitution, are a valid and binding contract, between the General Government and the State, and neither of the high contracting parties can change, modify, or alter the stipulations and conditions of the same, without the consent of the other. By this compact the State of Illinois is vested with the legal title to the land contained in sections sixteen in each township, or the lands selected in lieu thereof; and the State is a purchaser thereof for a valuable consideration; and it rests with the State to determine in what manner the lands can be best applied to the objects and purposes for which they were purchased.

If the consent of the inhabitants of a township was necessary before a sale could be made of the sixteenth or school section, that consent is provided for in the statute, which requires that the petition for its sale shall be signed by three-fourths of the white male inhabitants over twenty-one years of age.

The true construction to be given to the compact between the United States and this State, in relation to the sixteenth or school sections of land, is that they are to

be leased, or sold, as the State legislature, the sole manager of them, shall think most beneficial to the people.

The Government of the United States is not, and never was, a donor for charitable purposes.

The statute authorizes the computation of interest at the rate of 20 per cent. per annum only on money loaned by a school commissioner, where the same is not paid when due; and not upon notes given for the purchase of school lands.

THERE were several cases in which substantially the same questions were involved as in this case, and by agreement of the respective counsel, the arguments were made herein.

The main questions involved were:

Are the laws of 1829, 1831, and 1833, authorizing the sale of the sixteenth or school sections of land constitutional?

Do the purchasers take any title by virtue of the sales under either of these laws?

The questions were argued by Justin Butterfield and James A. McDougall, for the appellant, and William Thomas, for the appellee, at the December term, 1841; and re-arguments were had at the December term, 1842, by James A. McDougall, for the appellant, and John J. Hardin, for the appellee.

JUSTIN BUTTERFIELD, for the appellant:

The whole legislation of Congress, and of the States which have been formed out of the North Western Territory, show that it was the intention that section number sixteen in every township, should be reserved from sale, and held in trust for the use of the inhabitants of each township, for the use of schools. That those sections were not to be sold, but to remain for all time to come as a permanent fund, the rents, issues, and profits of which to be applied for the support of schools. In theory, our Government rests upon the virtue and intelligence of the people; and its founders deemed it necessary to provide ample means for the diffusion of education. The North Western Territory was acquired in the year 1784, by deed of assignment from Virginia.

The first ordinance of Congress for ascertaining the mode of disposing of lands in the North Western Territory, passed 20th May, 1785, declared, "That there should be reserved, the lot No. 16 in every township, for the maintenance of public schools within said township." 1 U. S. Land Laws 852.

The fifth section of an act of Congress, entitled an "*Act making provision for the disposal of public lands in the Indiana Territory, and for other purposes,*" passed 26th March, 1804, provides "that section sixteen shall be reserved in each township, for the support of common schools within the same." 1 U. S. Land Laws 495.

Ohio was the first State formed out of the North Western Territory. The act of Congress to enable the people of the Territory of Ohio to form a Constitution and State Government, passed 30th April, 1802, provided that the following propositions should be

offered to the Convention of said Territory, when formed, for their free acceptance or rejection; which, if accepted by the Convention, should be obligatory upon the United States :

*First.* That section numbered sixteen, in every township, shall be granted to the inhabitants of such township, for the use of schools.

*Second.* That the six miles reservation, including the salt springs, shall be granted to the said State for the use of the people thereof, under such terms as the legislature shall direct.

*Third.* That one-twentieth part of the nett proceeds of the lands sold by Congress, after the 30th June, 1802, should be applied to the making of public roads leading to the said State : Provided always, the three foregoing propositions are, on condition, that the said Convention provide, by ordinance irrevocable, &c., that every tract of land sold by Congress, after the 30th June, 1802, should be exempt from all taxes for five years after sale. Dickens' Land Laws, part 1, 84.

But neither the inhabitants of the towns, nor the legislature of Ohio, conceived that they had any authority to sell these lands without the consent of Congress. An application for leave to sell was therefore made to Congress, and an act was passed on the 1st February, 1826, authorizing the legislature of Ohio to sell and convey any part of the land appropriated by Congress for the use of schools, and to invest the moneys in productive funds, for the use and support of the schools within the several townships, for which they were originally reserved and set apart: Provided said lands shall, in no case, be sold without the consent of the inhabitants of such township. 1 Dickens' Land Laws 406.

This act is a very important authority ; it is a solemn recognition, both on the part of Congress and of Ohio, that although Congress, twenty-four years before, granted these lands to the inhabitants of the townships, for the use of schools, Congress still retained the right of preventing the trust property from being sold or perverted ; that neither the legislature of Ohio, nor the inhabitants of the towns could, without the permission of Congress, change the nature of the trust, by converting the lands into money.

The next State formed out of the North Western Territory, was Indiana. The *"Act to enable the people of the Indiana Territory to form a Constitution and State Government, and for the admission of such State into the Union, on an equal footing with the original States,"* approved 19th April, 1816, provides, that the following propositions be, and hereby are offered to the Convention of the said Territory of Indiana, when formed, for their free acceptance or rejection ; which, if accepted by the Convention, shall be obligatory upon the United States :

*First.* Section sixteen, in every township, shall be granted to the inhabitants of such township for the use of schools.

*Second.* All salt springs in the Territory, and such lands as the

President may deem necessary for working the same, not to exceed thirty-six sections, shall be granted to the State, for the use of the people, to be used under such terms and regulations as the legislature shall direct.

*Third.* Five per cent. of the net proceeds of the public lands lying within the said Territory, shall be reserved for making public roads and canals, of which three-fifths shall be applied to those objects within the State, under the direction of the legislature, and two-fifths to the making of roads leading to the State, under the direction of Congress.

*Fourth.* One entire township of land shall be granted to the State for a seminary, to be vested in the legislature, and to be appropriated to the use of such seminary by the legislature.

*Fifth.* Four sections of land shall be granted to the State, for a seat of Government therein:

Provided, that the five foregoing propositions are, on condition that the Convention shall provide, by an ordinance, that land sold by the United States shall be exempt from all taxes for five years from the day of sale. The Convention passed an ordinance accepting of said propositions. It thus appears that Indiana, like Illinois, acquired the sixteenth section in every township, for the use of schools, by grant from the United States, accepted by an ordinance on the part of the State. Yet Indiana did not conceive that she had any right to authorize a sale of those school lands without the consent of Congress. An application was made for that purpose, and Congress passed an "*Act to authorize the legislature of the State of Indiana, to sell the lands heretofore appropriated for the use of Schools in that State,*" approved 24th May, 1828. 1 Dickens' Land Laws 443.

This act is the same as the act authorizing Ohio to sell her school lands.

Here we again see, that twelve years after Congress had granted these lands to the inhabitants of the townships of Indiana, for the use of schools, it was conceded on the part of Indiana, that these lands could not be sold, without the assent of Congress ; and that Congress asserted the right of prescribing the manner in which these lands might be sold, and how the proceeds of the sales should be invested.

The next State formed out of the North Western Territory, was Illinois. The act of Congress " *To enable the people of Illinois Territory to form a Constitution and State Government, and for the admission of such State into the Union, upon an equal footing with the original States,*" was passed the 18th April, 1818. By this act, Congress offered to the Convention assembled for the formation of the Constitution of said State, for their free acceptance or rejection, the following propositions; which, if accepted by the Convention, were to be obligatory upon the United States:

*First.* That section numbered sixteen, in every township, (and

when such section has been sold, or otherwise disposed of, other lands equivalent thereto) shall be granted to the State, for the use of the inhabitants of such township, for the use of schools.

*Second.* That all salt springs within such State, and the lands reserved for the use of the same, shall be granted to the said State for the use of the said State, and the same to be used under such terms and conditions as the legislature of said State shall direct, &c.

*Third.* Five per cent. of the net proceeds of the lands lying within the State, and which shall be sold by Congress, from and after the 1st day of January, 1819, after deducting all expenses incident to the same, shall be reserved for the purposes following, viz., two-fifths to be disbursed under the direction of Congress, in making roads leading to the State, and the residue to be appropriated by the legislature of the State, for the encouragement of learning, of which one-sixth part shall be exclusively bestowed on a college or a university.

*Fourth.* Thirty-six sections, or one entire township, which shall be designated by the President of the United States, shall be reserved for a seminary of learning, and vested in the legislature of said State, to be appropriated solely for the use of such seminary, by the said legislature.

The said four propositions were offered, on condition that the Convention should provide, by an ordinance irrevocable without the consent of the United States, that each and every tract of land sold by the United States, after the 1st of January, 1819, should remain exempt from any taxation laid by, and under authority of the State, for the term of five years from the day of sale. And further, that the bounty lands granted for military services during the late war, while held by the patentees, or their heirs, should be exempt from taxation for three years from the date of the patent, and that the lands of nonresidents should never be taxed higher than residents.

The said Convention, on the 26th day of August, 1818, passed an ordinance, by which they declared, that on behalf of, and by the authority of the people of the State, they " do accept of the foregoing propositions. And do further ordain and declare, that the foregoing ordinance shall not be revoked, without the consent of the United States."

I have thus recited the substance of the whole grant of Congress, and of the ordinance accepting the same, in order that the character of the transaction may fully appear. And the argument, that the State acquired these school lands by purchase from the United States, and paid a full equivalent therefor, (and therefore had an absolute right to dispose of the same,) may be fairly met and answered. The assumption that the State purchased these lands of Congress, and paid an equivalent therefor, is without any foundation. These lands were reserved for the use of the inhabitants of the township, for the use and maintenance of schools, by

the ordinance of the 20th May, 1785, and also by the act of 26th March, 1804. It would be extraordinary indeed, if the State of Illinois, in 1818, should purchase and pay an equivalent for lands for the use of schools, which had been so long before reserved by Congress for that very purpose. The payment of 5 per cent. by the General Government, in advance, out of the amount of sales of the public lands, is a full equivalent for exempting those lands from taxation for five years. It is 1 per cent. per annum, payable in advance, and without any trouble, expense, or hazard of collection. A sum much larger than most States impose upon farming land, by way of direct taxation. But whether the State received a full equivalent or not, is perfectly immaterial; she is bound by her compact. The terms in which the grant of these school lands was made by Congress, and accepted by the State, are proof that a sale was not intended by the one party, or a purchase by the other. The grant was to the State for a use, and accepted by the State to hold for a use. It will not be denied but the primary title and power of disposition of these lands were in the General Government, and that its grantee can only take just such an interest or title in the land, whether absolute or qualified, whether procured by donation or purchase, as Congress may choose to grant. The title of the State, to the lands in question, cannot be larger or broader than her grant. The State cannot, by her own legislation, enlarge her title. She is restrained from interfering in any way with the Federal Government, in the primary disposition of the public lands. See ordinance of 1787. What then is the character of this grant? Congress proposed to the Convention to grant section number sixteen in every township to the State, for the use of the inhabitants of such township, for the use of schools. The Convention, by ordinance, accepts the proposition, and also declares that the said ordinance shall not be revoked without the consent of the United States.

This grant and acceptance is a solemn compact, entered into (not between Congress and the legislature of Illinois,) but between Congress and the people of Illinois, in Convention assembled. It has the force of a fundamental law, and is, in fact, a part of the Constitution. The legislature have no more power to control, pervert, or repeal it, than they would have to blot out any part of the Constitution.

By the very terms of the grant and the compact, Congress and the Convention agree that the State shall stand seized of the sixteenth section for the use of the inhabitants, for the use of schools. The State was constituted a trustee; a mere *locum tenens.* The grant was of lands; and those very lands the inhabitants of the township were to have the use of, for the use of schools. The State could neither sell or dispose of these lands herself, or authorize others to do it. These lands were a sacred bequest, intended by the donor to remain as a permanent fund; the rents, issues, and

profits of which were to be applied for the maintenance of schools. The compact between Congress and the people, by which these lands were granted and accepted, goes behind all the subtle refinements of the law, in relation to uses and trusts. It was a plain, straight forward bargain, expressed in language of technical nicety, and legal precision. That the framers of this act well understood the difference between a grant of lands to the State, to hold for the use of schools, without the power of alienation, and the grant of lands to the legislature of the State, to be appropriated for a seminary of learning, using language that clearly authorizes an alienation of the land, will be very perceptible, by reference to that part of the act, granting thirty-six sections, or a township, for that purpose.

It most clearly appears, that, for the first twelve years after the grant of these school lands was made, it was perfectly well understood by the legislature, that the State had no power to authorize their sale. The lands were granted in 1818. The first legislature held in this State was in 1819. Many of its members were in the Convention which formed the Constitution, and adopted the ordinance accepting of the grant of the said lands. It is but reasonable to suppose that the legislature of 1819 well understood whether they did, or did not possess the power of alienating these lands. They passed an act, entitled *"An Act relating to the Lands reserved for the use of Schools;"* approved 2d March, 1819. The very title of this act shows that they considered these lands as reserved "for the use of schools;" lands which the State merely held in trust, not to be sold, but reserved for the use of schools. This act provided that the county commissioners, in each county, should appoint three trustees in every township, (where the population would admit,) which said trustees, in each township, were authorized to lease the school lands in their respective townships, for the period of ten years, from the first day of January, 1820; the rents to be appropriated for the support of schools. Another act was passed at the same session, to prevent trespassing, by cutting timber on any lands reserved, appropriated, or intended for the use and support of schools. On the 17th of February, 1827, an act was passed, entitled an *"Act relating to Schools."* This act repeals the act of 2d March, 1819, but confirms all leases made, and lawful acts done, or rights acquired under that act. The said act of 1827 requires the county commissioners' court, of each county, to appoint three trustees in every township, (where the population will admit,) to be called the "Trustees of the school lands," to hold their office for four years; said trustees to be a body corporate, and may sue and be sued; the trustees to lease the school lands in their respective townships, for a term not exceeding ten years, upon the best terms that can be obtained.

On the 22d day of January, 1829, an act was passed, entitled *"An Act authorizing the sale of sections numbered sixteen, or such Lands as may be granted in lieu thereof, to the inhabitants of such*

*Townships, for the use of Schools.*" The first section of this act is in these words : " Be it enacted by the people of the State of Illinois, represented in the General Assembly, that, so soon as the Congress of the United States shall assent, that section numbered sixteen, in each and every township, or such lands as may have been, or which may hereafter be selected in lieu thereof, granted to the inhabitants of each and every township, for the use of schools, may be sold ; and when that fact shall be known to the Governor, it shall be the duty of the Governor to announce the same to the inhabitants of the State, by a proclamation, published in all the newspapers in the State, for three weeks successively."

Here is an express admission on the part of the legislature, made ten years after the grant of these school lands, that the State could not make a sale of the lands, until Congress should assent ; and such assent was to be announced by the Governor's proclamation. The said act proceeded to make it the duty of the county commissioners' court, on proclamation being made, as aforesaid, to appoint a school commissioner in each county, who is authorized to sell at public auction, section sixteen, in any township, upon petition being made to him, signed by nine-tenths of the freeholders and householders of such township. And the Governor shall execute patents for the land so sold, which shall completely vest in the purchasers the fee simple, a sure, perfect, and absolute title to the land so purchased and patented. The said commissioner is directed to loan the purchase money for the best and highest interest he can get upon personal security, in sums not exceeding one hundred dollars ; sums exceeding that amount, to be secured by mortgage on real estate.

Congress did not assent to the sale of said school lands, and, therefore, the said last mentioned act did not go into effect. But on the 15th February, 1831, the legislature passed an act to amend the said last mentioned act, by repealing the first section, and some other parts thereof ; and declaring that the provisions of the act of 22d January, 1829, should be carried into effect, and sales made, and patents issued, as fully as if Government had assented to the sale, provided, that no land should be sold, unless petitioned for by three-fourths of the white male inhabitants in the township, over twenty-one years of age ; and that no sale of such lands shall be made in any township, unless the same contains at least fifty white inhabitants.

By an act, passed 1st March, 1833, the law requiring the school lands to be valued and appraised before sale, is repealed ; and the only provision now is, that they shall not be sold for less than one dollar and twenty-five cents per acre.

By an act of January 12th, 1833, the commissioner may sell the said lands on a credit of one, two, and three years.

It will then be seen that the legislature of Illinois, up to the 15th February, 1831, conceded that they had no right to authorize a sale

of the school sections, until the assent of Congress should first be obtained. It is not known what occasioned the legislature at that time to change their views, and assume the power to sell these lands, without the assent of Congress. Since that time, a most shameful sacrifice of these lands has been made. A few of the first settlers of a township, (fifty souls are sufficient) if the school section is good timber land, form a combination, for the division of the land among themselves, and agree that no one shall bid more than one dollar and twenty-five cents an acre. They then petition for a sale; purchase in the land at one dollar and twenty-five cents an acre, on credit; go security for each other; strip it of its timber; and, in many instances, never pay for the land. The fund is thus wasted, and no schools are established. The statement from the Auditor's Office shows that the sixteenth sections amount in the aggregate to 1,007,980 acres of land; that there have been sold, under the above recited laws, 299,802 acres; and that there remains unsold 708,178 acres; so that there is yet time for this Court to interfere, and save the greater portion of this rich heritage for posterity.

Having thus stated the facts, and legislation of Congress and the State, in relation to the said school lands, I will proceed to examine the law on the subject.

These lands are a charity. The United States are the donors, or the patrons. The State is the trustee, which stands seized of the land, for the use of the inhabitants of the township, for the use of schools. The schools are the beneficiaries.

The trustees of a charity have no authority to make an absolute disposition of the charity estate. They cannot part with lands to a p urchaser, and substitute, instead, the reservation of a rent. And, as the trustees may not alien absolutely, so they may not accomplish the same end indirectly, by demising for long terms, as for 999 years; or for terms of ordinary duration, with covenants for perpetual renewal. Lewin on Trusts 403.

A trustee has no right to alter the nature of the trust property, as by changing land into money, or money into land. 2 Tuckers' Com. 457; 7 Bac. Abr. 153.

The power of the trustee over the legal estate vested in him, exists only for the benefit of the *cestui que trust*. No act, or negligence, of the former, can prejudice or narrow the title of the latter. 2 Tucker's Com. 436, and the authorities there cited.

In 2 Fonblanque 167, the preceding doctrine is clearly laid down. See also 3 Peters 119.

The case of the Town of Pawlett v. Clark *et al.*, 9 Cranch 292, is an authority, which seems to me, to settle the case now under consideration. There was a grant by the crown, of " one share (of land) for a glebe, for the church of England, as by law established." Justice Story, in delivering the opinion of the Court in that case, says, " The glebe could not, before the erection of the church, be aliened by the crown, without their (the parish's) con-

sent. Nor after the erection of a church, and the induction of a parson, could the glebe be aliened, without the joint consent of the crown, as patron, the parson, as *persona ecclesiæ*, and the parishioners of the church, as having a temporal, as well as spiritual interest; and thereby, in effect, representing the ordinary." Again, he says, "After such a grant, executed in the parson, it would become a perpetual inheritance of the church, not liable, even during a vacancy, to be diverted; though, by consent of all parties interested, viz., the patron and ordinary, and also the parson, if the church be full, it might be aliened, or incumbered."

It has been contended, by those who advocate the other side of this case, that these school sections were not a donation by the General Government, but that the State purchased them, and paid a full equivalent, by surrendering the right of taxation of the lands sold by Government, for five years; and that, therefore, the authorities above cited, in relation to charities, do not apply. In answer, I would say, first, that the said lands were a donation; secondly, that whether the State did or did not pay for them, she accepted of the grant in trust, and cannot pervert the trust.

The act of the legislature of Illinois, of 1831, authorizing the sale of those lands, was a clear breach of trust. Congress originally stood seized of the school lands, and it had a perfect right to deal with them in its discretion, by an absolute sale, or by a grant of them in trust for charitable uses; and it was competent for Congress to make any State legislature a trustee to be seized for any charitable use; and if the State accepts of the grant, as such trustee, it is as much bound to sustain and execute the trust, in good faith, as any private individual would be, in a like case. The members of a legislature are as much bound by the laws of moral obligation, in their official capacity, as they are when acting as private individuals. The State cannot, with impunity, violate a trust. The sales that have been made in breach of said trust, would be adjudged to be void in a court of competent jurisdiction.

WILLIAM THOMAS, for the appellee:

Actions were commenced in the Circuit Court, by the appellee against the appellant, upon notes executed for the consideration agreed to be paid for parts of a sixteenth section; and the defence relied on was, that the sale was void, because the legislature had no power to authorize such sales. Upon demurrer to the pleas making this question, the Circuit Court decided the causes in favor of the defendant in error.

It is insisted by the appellant, that the legislature has exceeded its authority, in attempting to authorize the sale of these sections; and that, therefore, purchasers are not bound to pay for them.

By the act of Congress, of the 18th April, 1818, entitled "*An Act to enable the people of the Illinois Territory to form a Constitution and State Government, and for the admission of such State*

*into the Union, upon an equal footing with the original States,*" it is provided, " That section numbered sixteen, in every township, and when such section has been sold, or otherwise disposed of, other lands, equivalent thereto, and as contiguous as may be, shall be granted to the State, for the use of the inhabitants of such township, for the use of schools." This grant, being accepted by the State, became obligatory upon the National, as well as the State Government. R. L. 50. The appellee insists upon the following propositions :

*First.* The legal title to the land is vested in the State, as trustee, without any other restriction than the use to which the land may be applied.

*Second.* The trustee may use the trust fund according to the wishes, or directions of the *cestui que use.* 2 Christan's Blac. Com. 328 1 Cruise's Dig. 350–1.

*Third.* Two estates were created by the act of Congress, viz., legal and equitable. The former is vested in the State ; the latter in the inhabitants of the township. Legislative action was therefore necessary, to reduce the subject of the grant into possession, and place it in a position to be used.

*Fourth.* The inhabitants of the township cannot assemble in mass and use, or direct the mode of using, the school lands ; the power and right to use the lands must necessarily depend upon legislative action. The Town of Pawlett *v.* Clark *et al.*, 3 Peters' Cond. R. 408 ; 9 Cranch 292;

*Fifth.* The act of Congress does not convert the inhabitants of the township into a body politic, or corporate ; nor does it attempt to confer any power of action upon such inhabitants.

In the truth, or upon the assumption of the foregoing propositions, will be found the reasons for the action of the legislature. The first act on this subject was passed 22d January, 1829. Acts of 1828–9, 50. In passing this act, the legislature assumed that the consent of Congress, as well as of the inhabitants of the township, was necessary, before any sale could be made ; and, therefore, provision was made for sales, " so soon as the Congress of the United States shall assent, and nine-tenths of the legal voters of the township shall petition for the same. The second act was passed 15th February, 1831, (1) which provides for sales without the assent of Congress, upon the petition of three-fourths of the legal voters of the township. The third act, passed 12th January, 1833, (2) provides for selling on credit, and contains no other provision.

By these acts, the inhabitants of townships are authorized to consent to a sale of the school lands held in trust for their use. Provision is made for executing the trust on the part of the State, and for using the money arising from the sale of the trust property, for

(1) Laws of 1830–1.         (2) R. L. 566, Gale's Stat. 633.

the support of schools.  Upon the request of the inhabitants of the township, the lands are sold ; the purchaser obtains a patent from the State, which the law declares, "shall completely vest in the purchaser, or purchasers, a sure, perfect, and absolute title."

Upon the foregoing premises, the appellee insists upon the fol- the following propositions :

*First.*  That the State, and the inhabitants of the township are bound and concluded, by action under the laws; that the State cannot make or repeal patents ; and that the inhabitants of the township cannot act in the premises, except by authority of the State.

*Second.*  The rights of purchasers under the law, cannot be divested, or impaired by any act of the legislature, or the inhabitants of the township, or of both together, because both are concluded by their action.

*Third.*  Where two estates exist in different persons competent to contract, the whole estate will pass, and become united, by a conveyance of the parts to one person.  Douglass 771–2 ; 2 Christan's Blac. Com. 177 ; 2 Burr. 1898.

*Fourth.*  Assuming that the State is bound and concluded by its own action in the premises, the purchaser of the sixteenth section acquires the legal title ; and admitting that subsequent inhabitants of a township are not concluded by the acts of their predecessors, still the purchaser stands in the place of the State, and holds the land subject to the same use for which the State holds it ; and whilst he is permitted to enjoy the benefits of his purchase, he cannot withhold from the township the purchase money.  And this view of the subject shows that the remedy of the appellant (if any he has) is in a court of equity.

*Fifth.*  The legal existence of the inhabitants of townships depends upon legislation.  They can neither do nor suffer any act, without authority from that department; and this case is now presented before the Court, in which the attempt is made to place them in a position to lose the land granted for their use, as well as the price agreed to be paid for it by purchaser.  The legal title to the land being vested in the purchaser, he cannot defend in this Court. Jackson *v.* Van Dalfsen, 5 Johns. 43 ; 14 Johns. 415.

*Sixth.*  If the defence be regarded as resting upon the ground that the notes were given without consideration, the facts stated disprove this assumption.  If it rests upon the ground of failure of consideration, the answer to this view of the subject is, that the notes were given to a third party ; and that the second party is liable upon the warranty in the patent, in case the land is lost.  The liability of the State upon the covenant contained in the patent, is a continuing consideration for the promise to pay the purchase money ; and whilst this liability exists, the plea of failure of consideration cannot be sustained.  Young *v.* Triplett, 5 Littell 247 ; Snyder *v.* Laframboise, Breese 268 ; Kelson *v.* Fry, 4 Bibb. 493 ; 3 J. J. Marshall 112 ; Greenleaf *v.* Cooke, 4 Peter's Cond. R. 8.

*Seventh.* The State is interested in the event of this suit, and is a necessary party to the case in which the questions involved are decided ; and the Court will not decide upon the rights of the State, any more than it would upon the rights of an individual, without affording an opportunity of defence or hearing. The People *v.* Forquer, Breese 6S; 14 Johns. 415.

Upon a- consideration of all the questions presented in the case, the appellee insists that the law of the case is with the appellee ; that, the appellant can have no relief in a court of law ; and in a case between the school commissioner and purchaser, if the purchaser is entitled to relief, he can only obtain it in a court of equity, where the State, as well as the inhabitants of the township, can be made parties.

In reply to the argument of the appellant, the appellee insists upon the following:

*First.* That the grant of the sixteenth sections cannot be considered as a charitable donation, because the United States received a fair equivalent in the exemption of the public lands from taxation, before, and for five years after the sale.

*Second.* The United States retained no right, and does not possess the power to control the action of the State, in relation to the manner of using the lands granted.

*Third.* The principles of law applicable to charities and donations for charitable uses, have no application to this case.

*Fourth.* Admitting that the lands were donated, and without any pecuniary consideration, the United States has not reserved any power to control the subjects of the grant, or the action of the trustee ; and without such reservation, that Government has no power over either, except such as necessarily results from, or is implied in, the nature of the trust.

*Fifth.* To admit the power of the United States to control the State on the subject of the grants, would be equivalent to an admission of the power of that Government to control one thirty-sixth part of the soil of the State, to the exclusion of the State authorities.

*Sixth.* The National Government has not the power to act in reference to the trustee, or the subject of the trust, which donors for charitable uses in England have ; and to place the United States in this position, with reference to the State, and these lands, would be subversive of the sovereignty and independence of the State.

*Seventh.* The Court cannot, and will not, construe the grant as contended for by the appellant, for two reasons : first, such construction is not necessary to the execution of the trust; secondly, by such construction the execution of the trust cannot be enforced, because of the defect of power in the National Government, or any of its departments, or in the courts of the State, to compel the legislative department to act upon the subject.

*Eighth.* According to the notions advanced here, we have what is equivalent to a perpetual corporation, in every township in the

State, created by the National Government, and controlling, with the aid of that Government, one thirty-sixth part of the territory of the State. It is insisted that the National Government has no power to create or maintain any such corporation.

*Ninth.* The argument attempted to be drawn from the action of Congress, with reference to the sixteenth sections in Ohio and Indiana, is not sustained by that action, because, in both acts, the right of the inhabitants of the township to direct the sale is expressly recognised, and the sale is authorized to be made, upon obtaining their consent, in such manner and form as the legislatures of the States may direct.

*Tenth.* If it be true, as is contended, that the grant creates a perpetual use in the land in behalf of schools; that neither the State, nor the inhabitants of the township, are to be regarded as the *cestui que trust*, but that the schools are, then no act of Congress, or of the legislature of the State, or of both, can authorize a sale upon request of the inhabitants of the township ; and the acts of Congress, with reference to Ohio and Indiana, are nugatory and void.

JAMES A. McDOUGALL, for the appellant, relied upon the following points and authorities :

1. The nature of the grant by Congress and its terms. First reservation of school lands by Congress. Dickens' Land Laws 13.

Proposition authorizing Illinois to form a State Government, and offering to donate lands for the use of schools, for the free acceptance or rejection of the State; if accepted to be obligatory on both the State and General Government. Dickens' Land Laws 301.

Ordinance of the Convention accepting the proposition, not to be revoked without the consent of the United States. Gale's Stat. 38 ; R. L. 50. This shows a contract of the force of fundamental law, creating the State of Illinois a trustee of the sixteenth section, for the use of schools, wherein the United States is donor, the State the trustee, and a charity in each township, the *cestui que trust.*

2. The nature of the trust estate created, and the power of the trustee.

Bacon defines the properties of a use to be pernancy of profits, execution of estates, and defence of the title. A use is a trust reposed in the terre-tenant, that he will take the profits and perform the intent of the proffer. Willis 57 ; Cornish 15.

A charitable use has pernancy of profits, and defence of the title, but not execution of estates.

No trustee that holds for the benefit of himself and others, has the *jus disponendi.* Lewin on Trusts 486.

Trustees of charities have no power of alienation. Lewin on Trusts 403.

They may not grant long leases. Lewin on Trusts 407 ; Ambler 201 ; or leases with perpetual renewal. 10 Vesey 557–8.

They cannot change the nature of the trust estate. General description of eleemosynary institutions of this class. 2 Story's Eq. 242 ; Ambler 242 ; 7 Bac. Abr. 153 ; 12 Mass. 575–6.

3. The grantors of a charity have a right of direction to see that the trust estate is properly applied; therefore the United States must be consulted ; " *cujus est dare, ejus est disponere.*" 3 Peters' Cond. R. 421, case of the town of Pawlett ; Dickens' Land Laws 406, Ohio, 443, Indiana, 491, Missouri, 491, Illinois, authorized to sell saline lands ; Ills. Stat. 1829, 150 ; *Ibid.* 1831, 172 ; Tennessee Land Laws 14 ; Tenn. Stat. of, 1825, 132 ; Tenn. Stat. of, 1826–7, 47, 645 note.

4. The act of sale by the patron and trustee, must be joined by the *cestui que trust.* It required the crown as patron, the parson as person *ecclesiæ,* and the ordinary as having charge of the interest of the church or charity, to convey the lands of the church. It required the patron, the trustees, and the continuing charity as guardian of charities, to grant the estate of an ordinary charity. The case of the Town of Pawlett.

5. In this case, the *cestui que use* cannot act themselves ; they are the beneficiaries of a perpetual and continuing charity ; a part of them will be in existence perhaps in future centuries.

6. The ordinary rule is, that a person purchasing without notice of a trust, when the trust was concealed, takes a good title. If he has notice, he is charged with the trust. Story's Eq. 507.

7. The question as to the operative nature of the estate granted, whether void for want of person *beneficiary.* Coggleshall *et al.,* Trustees, &c. *v.* Pelton, 7 Johns. Ch. R. 294 ; Attorney General *v.* Clark, Ambler 422 ; 3 Peters' Cond. R. 418–9, Town of Pawlett case, 6 Paige 649 ; Potter *v.* Chapin, overrules the case of Hunt's Ex'rs, 2 Peters 556 ; 3 Peters 99 ; 7 Paige 79.

The statute of Elizabeth was only a reënactment of the previous law, &c. 7 Paige 79, 80.

JOHN J. HARDIN, for the appellee :

The conveyance of the sixteenth sections to the State, is either a grant upon consideration received by the United States Government, or it is a donation for the benefit of the inhabitants, which the State holds as trustee, and therefore cannot sell.

*First.* Suppose the State holds it as trustee, then the inhabitants must be the *cestui que trust,* the schools being neither a body corporate or politic; and being merely a means of benefit to the inhabitants of the townships, cannot be the *cestui que trust.*

The trustee may sell the trust estate with the assent of the *cestui que trust.* 2 Cruise's Dig. 488.

The inhabitants cannot meet in a body and act, and there must

be legislative action first, before they can legally act. Town of Pawlett v. Clark et al., 3 Peters' Cond. R. 408, 423–4.

The legal estate being in the State, as trustee, and the equitable estate in the inhabitants, and both assenting to the sale before it was made, authorizing their agent, the school commissioner, to sell for them, all the estates have merged in the purchaser; the title is perfect.  Douglass 771; 3 Burr. 1898; 2 Blac. Com. 177; 7 Bac. Abr. 154, note.

The powers of trustees. Trustee may convey to a *bona fide* purchaser, without notice, so as to bar the *cestui que trust.* 2 Story's Eq. 241; 2 Cruise's Dig. 489.

Duties of a trustee.  2 Story's Eq. 510; 2 Cruise's Dig. 488.

*Cestui que trust* hath *jus habendi et jus disponendi.*  7 Bac. Abr. 185; 2 Cruise's Dig. 488; Lewin on Trusts 487.

The two estates form a fee simple estate.  Both uniting, they can always alienate their estate.  4 Kent's Com. 5.

When a thing is given or granted, the law gives impliedly whatever is necessary for the taking and enjoying the same.  11 Peters 617; Coke Lit. 56 a; 11 Peters 646–7; 1 Cruise's Dig. 66, § 49.

When the use is granted, everything is granted by which the grantee may have and enjoy the use.  11 Peters 630; 1 Saund. 321, 323, note 6.

The grant by Congress passes an estate in fee.  3 Peters' Cond. R. 423.

*Second.*  The purchasers have no right to make this defence; because they hold by purchase all the title of the State, which is the legal estate.  They also have obtained possession under their sales, and have received a partial consideration.  They have also received a deed with covenants of warranty from the State.  These constitute a sufficient consideration to support the promise in the notes sued on.  Young v. Triplett, 5 Littell 247; Snyder v. Laframboise, Breese 268; Kelson v. Fry, 4 Bibb. 493; 3 J. J. Marshall 112; Greenleaf v. Cooke, 4 Peters' Cond. R. 8; 16 Johns. 267; 20 Johns. 15.

The State and the inhabitants are both parties in interest, and to decide this case against the validity of the sales, affects the rights of the State on its warranty, and the rights of the inhabitants to the price of the land; and this Court will not decide in such case at law.  The defence, therefore, is in equity (if at all), where all parties can be heard.  The People v. Forquer, Breese 68.

The sale is not void, but voidable, (upon the supposition of the vested interest in the inhabitants) and the *cestui que trust* may never object to the sale, and thereby the title will be perfected by the lapse of time.  5 Johns. 43; 14 Johns. 415; 2 Cowen 195; Lewin on Trusts 641–2.

*Third.*  A trustee (though not generally thereto authorized) may change the nature of the trust estate, if it is manifestly for the

advantage of the *cestui que trust.* 7 Bac. Abr. 154 ; 1 Vesey 461 ; Ambler 370, 417 ; Lewin on Trusts 404 ; 2 Story's Eq. 242.

If the State, by its acts, has injured or destroyed the trust estate, it is liable to the *cestui que trust.* 2 Cruise's Dig. 496 ; Lewin on Trusts 686. And it may make such arrangement with the inhabitants, &c., to avoid difficulty, and the purchaser would then be uninterrupted.

This case (based upon the foregoing supposition) is virtually decided in the case of Town of Pawlett *v.* Clark. 3 Peters' Cond. R. 413. It is there held that the State, (the grantor) with the assent of the town, (the *cestui que trust* by operation of law) may alien or encumber the trust estate.

The General Government has not reserved the right to act as a visitor, and inspect the management of trust funds by the State, and no such authority can be implied ; as it would vest a supervisory power in the General Government over one thirty-sixth part of Illinois, to the exclusion of the State authorities. This is inadmissible.

*Fourth.* Townships are incorporated by act of 1833. Suit is by school commissioner, or their agent, and for their use, on notes payable to him. Now a debtor of a corporation cannot set up as defence to his note, that there is no such corporation. 6 Cowen 23 ; 9 Wend. 382 ; 8 Wend. 645 ; 14 Johns. 245.

It follows, therefore, that a school commissioner, acting as trustee for the incorporated township, should be protected in his right to recover, until the corporation is dissolved by order of court, or sales are set aside upon a hearing of all the parties in interest.

But I hold the State does not hold as a trustee, according to the common law doctrine of trust estates :

*First.* Because courts of equity have exclusive jurisdiction over trusts, and make orders to force trustees to carry out the trust. 2 Story's Eq. 230.

A court of equity never wants a trustee ; this is a rule without an exception. 2 Story's Eq. 240.

The above rules never can operate on the State ; for the State is a sovereign, and cannot be compelled to act as a trustee. 1 Cruise's Dig. 365.

The State cannot be sued, and the trust would fall, if the usual principles of law in regard to trusts prevail.

The General Government never reserved a right of visitation, as is usual in cases of charitable bequests ; and without such reservation no such right will be implied in this case. If it were so, then Congress, by its visitatorial power, would control one thirty-sixth part of the territory of the State.

The State, being a sovereign State, could not submit to such terms.

Again : the inhabitants could not, and never can, act legally without the direction and legislative action of the State, which is

the supposed trustee. So that this case would present the anomaly, in trust cases, of a trustee who could prevent his *cestui que trust* from ever asserting his rights.

For these reasons :

1. That the State is a sovereign, and cannot be sued or compelled to execute a trust.

2. That courts of chancery, which have exclusive jurisdiction in cases of trust, cannot enforce this trust.

3. Because another trustee cannot be appointed in case the State refuses to execute the trust, or misuses the trust funds.

4. Because no visitatorial power has been, or could be exercised, or reserved by the General Government in this case.

5. Because the State, the trustee, can forever prevent the action, by suit, of the inhabitants of the townships, the *cestui que trust.*

I hold that the above legal positions, which apply to this case, being wholly incompatible with trust estates, it therefore necessarily follows, that the grant or bequest of the sixteenth sections, is not a trust estate subject to the usual laws regulating trusts.

*Second.* It is not clear, from the terms of the ordinance, that it was "the object and intent to create a trust," which is always necessary to create a trust. Willis 685 ; 2 Story's Eq. 243.

The interest which the State holds is a fee simple absolute estate, subject only to the condition that the State would act in good faith, in appropriating the sixteenth sections to the use of schools in the townships.

In its terms it is a grant to the State. A grant purports to convey a fee simple absolute. 2 Peters' Cond. R. 321.

The Government has received a consideration for the grant. There are 1.007.980 acres in the sixteenth sections in Illinois, which at $1.25, would bring the Government $1.259.975. There are 32.000.000 acres saleable land in Illinois. Supposing the average valuation assessed, during the five years it is exempt from taxation, to be $3 per acre, and that 50 cents on the valuation of each $100 worth of property, would be the average tax on such lands for State and county purposes, it would be $480.000 per year, which the State loses by the exemption. In five years, this would amount to $2.400.000, which is more than the Congress price of the whole sixteenth sections in the State.

Congress obtained for the purchasers of its lands this exemption, and therefore it is a sufficient consideration for the grant ; for a consideration is either a profit to the seller, or a loss to the purchaser. Besides, it obtained the agreement of the State never to tax nonresidents' lands higher than lands of citizens of the State, which is an additional consideration.

The grant of the saline lands is nearly in the same words, and the State would have had the power to sell these lands, except for the proviso inserted in the grant of saline lands.

The State has exercised its discretion in ordering the sales of

the sixteenth sections, by the consent of three-fourths of the inhabitants of the township, and the funds are appropriated to their use. There is, therefore, no right of complaint that the trust funds have been misapplied.

If, however, it was a gift, and not a grant, on consideration, still it is binding between donor and donee, and third parties can have no right to interpose, unless they are creditors, &c. 4 Kent's Com. 462.

This Court should hesitate to decide these sales void, when 320.000 acres of the best land of the sixteenth sections have been sold, for which the purchasers hold warranty deeds from the State. The amount of $1.000.000 now devoted to school purposes, will be lost, if this sale is declared void.

This question is decided by the act of Congress, passed at its present session, legalizing the sales already made.

By this act, and the previous action of the State and inhabitants of the townships, the legal title of the State, the equitable title of the inhabitants of the townships, and the release and confirmation of the General Government, the grantor or donor, vest in the purchaser, and no encumbrance hanging over the land, the title is perfect.

SEMPLE, Justice, delivered the opinion of the Court:

This was an action on a promissory note. The facts, as they appear on the record, show that the note was given for the purchase of a part of section numbered sixteen, in township number one north, range number five west of the third principal meridian, in the county of Clinton, sold by the appellee, as school commissioner of Clinton county, under and by authority of an act of the legislature of the State of Illinois, authorizing the sale of the sixteenth section. The Circuit Court gave judgment for the plaintiff below, for the amount of the note, and 20 per cent. interest thereon. To reverse this judgment, the case is now brought to this Court by appeal.

It is insisted on the part of the appellant, that the legislature had no power to order a sale of the sixteenth section; that the purchaser acquired no title by virtue of such sale, and that, consequently, there was no consideration for the note.

This Court is of opinion that the legislature had full power and authority to authorize a sale of the land, and that, consequently, there was a good and valuable consideration for the note.

The act of the 22d January, 1829, provides, that whenever the assent of the General Government should be obtained, and on the petition of nine-tenths of the inhabitants of any township, the school commissioner should proceed to sell the lands contained in section number sixteen, or other lands selected in lieu thereof, for school purposes, in such township.

The act of the 15th February, 1831, provides, "That the county

commissioners' court of each and every organized county, shall, at any regular term, proceed to select and appoint the commissioner for the county, and require bond, or bonds, as stipulated in the act of the 22d January, 1829, to which this is an amendment; and that all other provisions and stipulations in said act shall be carried into effect, sales made, and patents issued, as fully as if Government had assented to the sale ; and that the sales made as aforesaid, shall be valid, provided that no land shall be sold, unless petitioned for, as pointed out in the act hereby amended, by three-fourths of the white male inhabitants in the township, over twenty-one years of age ; and provided also, that no sale of such lands shall be made in any township, unless the same contains, at least, fifty white inhabitants."

The act of the 12th January, 1833, authorized the lands aforesaid to be sold on a credit of one, two, and three years, &c.

These acts fully authorize the sale of the sixteenth section in certain townships ; and that, for a part of which, the note in question was given, was one of them. But it is contended that the State legislature had no power or authority to pass any law authorizing the sale of sections sixteen ; that the inhabitants of the several townships, in which such lands are situated, acquire a vested right in them, for the purposes specified in the acts of Congress, and that no subsequent legislation would divert that right. The several acts of the State legislature, authorizing the sales, are said to be entirely void, and that this Court is bound to treat them as a nullity, in the decision of this question.

When the validity of an act of the State legislature is called in question, and especially when it is contended that it is void, because it conflicts with an act of Congress, it is proper to enquire into the sources from whence the two governments derive their powers. This is a matter of great importance. It is a question of law, as well as of politics. If a law of a State, and a law of the United States conflict, it does not necessarily follow that the law of the State must yield. There is no subserviency, no inferiority on the part of the State Government, which would render the State law void. On the contrary, the act of Congress might be void, and that of the State valid. The Government of the United States is one of delegated powers, derived from the States. That Government can do nothing, the power to do which is not expressly delegated, or necessarily implied from the powers delegated. These powers are, and ought to be, for general purposes, relating to the whole Union. When acting within these powers, the acts of Congress are necessarily paramount to any State law, because each State has yielded that power, by a compact with the other States, which compact cannot be violated, without a violation of good faith. But as the powers not delegated are reserved to the State, it follows, that as a State is sovereign, and unlimited in its legislative acts, it can pass any law whatever, that is not prohibited by the Constitution of the

Bradley *v.* Case.

United States, or of this State. It is, therefore, never necessary to enquire whether a State legislature possesses the power to do an act or not. The enquiry should be, is the act prohibited? If not prohibited, the power necessarily exists among those general, universal, and absolute powers, which every government must have to make laws for the regulation of society, and the disposition of every thing belonging to, or connected with the State.

The ordinance passed 20th May, 1785, is relied on as first vesting the right in the several townships to the sixteenth section. The words of the ordinance that relate to the subject are these : "There shall be reserved the lot number sixteen, of every township, for the maintenance of public schools within the said township ; also, one third part of all gold, silver, lead, and copper mines, to be sold, or otherwise disposed of, as Congress shall hereafter direct."

The object of passing this ordinance was, as stated in the title of the ordinance, "to ascertain the mode of disposing of lands in the Western Territory." The reservation of the lot number sixteen, and of the mines, was a mere direction as to what should be sold, and what should not be sold. By a strict construction of the sentence, as it stands in the ordinance, the words "to be sold, or otherwise disposed of, as Congress shall hereafter direct," might be applied to the reservation of the lot number sixteen, as well as to the mines. This construction would leave the entire reservation under the control of Congress. But suppose that the reservation of the sixteenth section, was, by the ordinance, a distinct reservation from that of the mines ? yet I cannot conceive it to be possible that an act of Congress reserving certain lands from sale, for a particular purpose, should be such a law as could not be altered, or modified, by the same power that made it. It was not a compact with any other power, government, or person whatever. Neither the passage nor repeal of it was required or prohibited, by any Constitution or paramount law. There was no Government of the State, or Territory, nor any inhabitants of the township, to take the lands for the use of schools, as specified in the ordinance, and the Government of the United States itself had, at that time, but an imperfect and doubtful state of existence. The ordinance does not import on its face, to be a compact. The term compact necessarily implies parties consenting on both sides. Congress could not make a compact, unless there had been a State, or other corporation, or person capable of agreeing to, or dissenting. This State could not, at that time, consent to such a compact, and it has never since consented. To suppose that such an ordinance, made at such a time, and under such circumstances, could have such binding powers, as to fix in persons, not then in existence, a vested and irrevocable right to lands, is, in my opinion, utterly untenable.

The true foundation of the right of the State to section sixteen in every township, is to be found in the act of Congress, entitled "*An Act to enable the people of the Illinois Territory to form a*

*Constitution and State Government, and for the admission of such State into the Union, on an equal footing with the original States.*" Approved 18th April, 1818. That act, among other things, provides, " That section numbered sixteen, in every township, and when such section has been sold, or otherwise disposed of, other lands equivalent thereto, and as contiguous as may be, shall be granted to the State, for the use of the inhabitants of such township, for the use of schools." This was one of the propositions offered to the Convention of the said Territory of Illinois, when formed, for their free acceptance or rejection; which, if accepted by the Convention, "shall be obligatory upon the United States, and the said State." The act then goes on to make three other propositions : one giving to the State certain salt springs; another giving 5 per cent. on the net proceeds of the sales of public lands ; and, lastly, one entire township of land, &c.

These propositions were subject to conditions as follows :

*Provided always,* that the four foregoing propositions, herein offered, are on the conditions, that the Convention of the said State shall provide, by an ordinance irrevocable, without the consent of the United States, that every and each tract of land sold by the United States, from and after the first day of January, 1819, shall remain exempt from any tax laid by order, or under any authority of the State, whether for State, county, or township, or any other purpose whatever, for the term of five years from and after the day of sale ; *and further,* that the bounty lands granted, or hereafter to be granted, for military services during the late war, shall, while they continue to be held by the patentees, or their heirs, remain exempt as aforesaid, from all taxes, for the term of three years from and after the date of the patents, respectively ; and that all the lands belonging to the citizens of the United States, residing without the said State, shall never be taxed higher than lands belonging to persons residing therein."

These propositions, with the foregoing conditions, were accepted by the Convention that formed our Constitution, and a solemn ordinance passed by said Convention, made irrevocable without the consent of the United States, binding this State not to violate the conditions attached to the said propositions. Here was a valid and binding compact, made by two governments capable of contracting; there was a thing to be contracted for; there was a good and valuable consideration passing between the parties, and neither could retract without the consent of the other. To this compact, then, we must look for the power and authority of the State to hold, or to sell and convey the lands referred to.

It is not denied that the State is, by the compact, vested with the legal title to the lands. It is said, however, that the land is vested in trust for certain purposes specified in the compact ; that the State is a mere trustee, and that the inhabitants of the township are the *cestui que use;* that all the incidents arising out of an application

of the rules of the common law to trust estates, or estates donated for charitable purposes, are to be applied to the lands held by this compact. I can never agree to this doctrine. I consider the State as a purchaser of the lands, for a valuable consideration. Previous to the formation of the State Government, the Government of the United States had an undoubted right to the lands. Had the State Government been formed without any restriction, it would have had, by virtue of its sovereignty, all the rights of any other sovereign State, to all intents and purposes. It would, by law, have levied taxes on all the property within its limits; as well the lands sold by the United States, before the expiration of five years from the day of sale, as all lands, or other property, owned by any person, or body corporate, or any other government whatever, having lands or other property, in the State. It would, moreover, if thought expedient or just to do so, have taxed the lands of those residing out of the State, higher than the lands of those residing within the State. This right of discriminating between citizens of the State, and foreigners, has been, and is now exercised by nearly all the governments of the earth. These rights of sovereignty, the State has, so far as the terms of the compact goes, and no farther, surrendered and relinquished, as a consideration paid for the right to hold these school lands. The Government of the United States is not, and never was, a donor for charitable purposes, as contended for in the argument. If there be any donor, it is the State. I think the State has paid dearly for the land. She has given, as an equivalent, two important rights of sovereignty; that of taxing the lands sold by Congress, and that of levying a discriminating tax on non residents.

The insertion of the words, in the grant from the United States to the State of Illinois, that the lands granted were to be applied to the use of schools, does not make the United States Government the donor for that purpose, or give that Government any right whatever to control the lands thus vested in the State. The State purchased the lands for a valuable consideration, for a certain purpose, and it now rests with the State to determine in what manner the lands can be best applied to the objects and purposes for which they were bought. Good faith will always require the State to apply the said lands to the purposes of education; and there is no doubt but that it will be done.

But suppose, for a moment, the doctrine urged in the argument of this cause to be correct; that the Government of the United States is the donor; that the State holds the legal title in trust, for the use of the inhabitants of the township, for the use of schools, does it follow that the sales, as made by authority of the State, are void, and vest no title in the purchasers? In order to test this question, let us see to what it would lead. If the inhabitants collectively take the use in this case, they must take as corporators, and not in individual right. They must take for the purpose of

maintaining schools within the township, and not for their own private use, or for any purpose other than that specified.  Indeed, the inhabitants of the township must be considered, by virtue of the grant above, as becoming a corporation, for the purpose of managing that particular grant, or the grant cannot otherwise be used.

According to the act of the State legislature, no school lands belonging to a township, can be sold, unless three-fourths of the white male inhabitants thereof shall give their consent, by petitioning for the sale of such lands.  How, under these circumstances, are the lands to be managed, either to be sold, leased, or rented, or in any other manner used for any purpose whatever?  How is the will of the inhabitants to be ascertained?  It must be done by the consent of a majority, or not at all.  The will of a majority of any aggregate corporation, is supposed to be the will of the whole, unless, by the act of its creation, some other mode of ascertaining such will is provided for.  If this were not so, the whole object of the corporation would be defeated.

In this case, if we could suppose that the grant for the use of the township was vested in the inhabitants severally, or even jointly, as individuals, and not in an aggregate, or corporate capacity, the right thus vested would be transferable.  It would not be divested by one of such inhabitants removing from the township, but would follow him wherever he went.  It would descend to his heirs.  It could be sold by him.  He could have partition, &c.  This would be absurd, in relation to the school lands.

The result, therefore, must be, that each of the inhabitants takes his right by virtue of his residence, or domicil in the township; and, of consequence, he must take as a corporator, and not as a joint, or several owner of private or individual property.  This corporate capacity of the townships, if it has any, may derive its existence from the very nature of the grant made to it, from the necessity of the case, and the utter impossibility of its being turned to the use intended, in any other way than by a united will of some sort.

Supposing, then, that the inhabitants of the townships are the sole owners of the use, and that they hold as corporators or as inhabitants, and not as tenants in common, then they have, by their own consent, expressed by three-fourths of them petitioning for a sale of the lands, agreed to the sale, and thus, on the principles contended for in the argument, the sale is valid, and the title vested in the purchaser, by the acts of both the trustee and the *cestui que use.*

I have said thus much, in order to show, that on the supposition that the inhabitants of the townships take the use, they can never claim any benefit from it, unless it be in a corporate capacity, implied from the nature of the use, or from legislative aid; and I have shown that if they can act as a corporation, they have acted in this case, and agreed to the sale of the lands.

But why is it that the whole management of the school lands in

Bradley *v*. Case.

Illinois, is not the proper subject of State legislation? There is surely nothing in the Constitution of the United States, or of this State, that prohibits it. There is nothing in the nature of the subject matter that renders it incompatible with the general powers of the legislature to manage and make rules and regulations for the government of the people of the State, and disposing of the property belonging to the State. Suppose that there is a moral obligation, binding on the State, if you please, to appropriate the sections numbered sixteen to the use of schools, where is the power that can prescribe, or that has prescribed, the manner in which this appropriation shall be made? If the act of Congress, which, being agreed to by the State Convention, formed the compact between this State and the General Government, had provided that the lands aforesaid should not be sold, or had made any specific provision, as to the manner in which they should be disposed of, then the question would have been settled. But that compact only provides, in general terms, that the lands " shall be granted to the State for the use of the inhabitants of such townships, for the use of schools." Whether they shall be leased for a term of years, rented annually, or sold, and the proceeds in either case applied according to the compact, to the use of schools, appears to me to be a proper subject of State legislation.

The sale of the lands not being prohibited by the compact, is of itself sufficient to authorize the legislature to exercise its general powers, to sell any lands that belongs to the State, by purchase or otherwise. I think there are other strong reasons for supposing that it was the intention of the parties to the compact, that they should be sold. The whole tendency of all the acts of Congress, and all State legislation, has been to sell all the Government lands, and not that either the General or State Governments should be, or remain, large land holders, and those who cultivated those lands, mere tenants. The cession of Virginia requires that all the lands should be sold. The lands reserved by Congress, containing salt springs, &c., made by Congress, have been from time to time sold. The genius of our people, and the nature of our free institutions, demand that lands should not be sold in large quantities by the Government, to the exclusion of private ownership. It is a part of the history of this country, that the great object of every one emigrating to the western country, is to acquire lands, by purchase, for himself and his children, in perpetuity; not to rent, or lease them, but to own them in fee simple. The greater number of persons interested in the soil, the more independent will the great mass of them be in the exercise of their rights as freemen. Whenever any large proportion of a state or nation stands in the relation of landlord and tenant, there can be but little independence. There is but little difference in the effects of this system, whether the lands are owned by the Government, and managed by public officers, or owned by individual wealthy landlords. In either case, the people

are tenants, and more or less subservient. So long, then, as it is the obvious policy of the Government to encourage the individual ownership of lands, and when we see that such has been and was at the time of making the compact aforesaid, the universal wish and desire of every one who emigrates; when we see that no one will rent land if it is in his power to purchase, and that Government rented lands scarcely ever produce any thing, how can it be supposed that the parties to the compact, intended (in the absence of an express provision to that effect, or words implying perpetuity,) that the lands should never be sold, or become private property? Can it be supposed that the parties to that compact intended that the lands should be sold without any immediate proceeds, merely for the benefit of posterity? Is not the present generation as much entitled to the proceeds of those lands, as the generation to come? Is there really not some preference due to the present generation? Those who have undergone the hardships of settling a wilderness, should rather be preferred than postponed. He who was born on the day of the making of this compact, if he be now living, has been four years a voter in Illinois. What benefit has he received from the fund appropriated to schools? I undertake to say none. This matter has been now postponed for twenty-five years. How much longer shall it be postponed? Shall another generation pass away, before the lands are applied to the uses and purposes intended by the compact?

These considerations are, in my opinion, proper for investigation here. They form a part of the history of the country. They throw light on the compact itself, and show conclusively, that the true construction to be given to the compact, is, that the lands were to be leased, or sold, as the State legislature, the sole manager of them, should think most beneficial to the people of the country.

So far as the errors assigned depend on the want of consideration for the note, they have entirely failed. The Circuit Court, in this respect, decided correctly. It appears, however, from the record, that the Circuit Court gave judgment for 20 per cent. interest on the note. The statute only provides for the payment of 20 per cent. interest on money loaned, and not upon a note given for the purchase of land. We cannot extend this statute farther than the words of it plainly show was the intention of the legislature.

For this error the judgment of the Circuit Court is reversed with costs, and judgment rendered in this Court for the amount due on the note, calculating interest at the rate of 10 per cent.

TREAT and DOUGLASS, Justices, dissented from so much of the opinion of the Court, as decides the sale of school lands to be valid; and CATON, Justice, said he was not prepared to concur with the opinion of the majority of the Court.

*Judgment reversed.*